UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT BASAT, #472479,

    Plaintiff,      CIVIL NO: 07-13332

                DISTRICT JUDGE DENISE PAGE HOOD
                MAGISTRATE JUDGE STEVEN D. PEPE
vs.

PATRICIA CARUSO, DOUGLAS VASBINDER,
DR. ANTONINI, JOY J. RYAN, CONNIE IVES, PEGGY LEE,
ALFRED JONES, NANCY MARTIN, JAMES ARMSTRONG,
JOHN DOE AND MARY DOE,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

  This is a *pro se* prisoner lawsuit under 42 U.S.C. § 1983 alleging violations of the Eighth Amendment and Americans with Disabilities Act ("ADA"). At the time of the incidents which give rise to the present action, Plaintiff was incarcerated at the G. Robert Cotton Correctional Facility in Jackson, Michigan, part of the Michigan Department of Corrections. Plaintiff currently is incarcerated at the Gus Harrison Correctional Facility in Adrian, Michigan. Plaintiff alleges that Defendants failed to treat an ear infection timely and/or properly, resulting in total hearing loss in his left ear as well as partial hearing loss in his right ear.

  Plaintiff filed this suit on August 10, 2007, and Defendants Patricia Caruso, Douglas Vasbinder, Joy Ryan, Connie Ives, Peggy Lee, Alfred Jones, Nancy Martin, and James Armstrong ("MDOC Defendants") were served via waiver on September 10, 2007. Plaintiff is

1

also suing Audberto Antonini, M.D., an independent contractor of Correctional Medical Services, Inc. ("CMS"), a private independent contractor of the State of Michigan (Dkt. #20, p. 6). On October 11, 2007, Defendant Antonini filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim and alternative motion for summary judgment under Fed. R. Civ. P. 56(b) based on failure to exhaust administrative remedies (Dkt. #20). All pre-trial matters were referred under 28 U.S.C. § 636(b) (Dkt. #5). For the reasons stated below, it is **RECOMMENDED** that Defendant Antonini's motion be **GRANTED**.

**I.    BACKGROUND**

Plaintiff alleges that he began having earaches in late January, 2004 (Complaint, pgs. 2, 9).[1] Health care told him that it might be an ear infection, gave him medication, and told him that it should clear up (*Id.* at pgs. 2, 9). On February 19, Plaintiff was transferred to the Cotton Correctional Facility ("JCF"), a "certified chronic care facility" (*Id.* at pgs. 2, 9). Plaintiff kited health care on March 1, complaining of leg pain and dizziness (*Id*. at pg. 9). After the first week of March, Plaintiff went to health care and was told that he had an ear infection (*Id.* at pg. 10).

On April 22, Plaintiff went to Foote Hospital for medical tests on his legs, but no tests were done on his ears (*Id.* at pgs. 2, 10). Plaintiff sent kites to health care on April 29 and May 21, but he did not receive responses. Plaintiff went to health care on May 25; his ear was flushed with peroxide and he was told that the infection would clear up (*Id*. at pg. 10). He alleges that this was done on his right ear only because the nurse said that the left ear looked "bad" and he didn't want to "fool with it" (*Id.* at pg. 11). On June 4, Plaintiff sent a kite to health care; the

---

[1] The page numbers refer to Plaintiff's type written Complaint, which begins on page 6 of Dkt. #1.

2

response by Defendant Ryan indicated that Plaintiff had an appointment on June 16 (*Id.* at pgs. 2, 11). That appointment was cancelled, and Plaintiff sent more kites on June 26 and July 9 (*Id.* at pgs. 2-3, 11). Plaintiff filed a Step I grievance on July 29, 2004; this grievance was answered by Defendants Ives and Lee (*Id.* at pgs. 3, 11-12). The response indicated that Plaintiff had an appointment for September 9. All of the above events occurred more than three years before Plaintiff filed this suit.

On September 9, 2004, Plaintiff went to health care and was prescribed Augmentin for his ear. On October 20, Plaintiff kited health care; he was told by Ryan that he had an appointment on October 25 (*Id.* at pgs. 3, 12). On that day, he waited for four hours before having to leave without seeing the doctor (*Id.* at pg. 12). Plaintiff filed a kite on October 28; on October 29, Plaintiff was prescribed the antibiotic Levaquin for his ears (*Id.* at pgs. 3, 12). Plaintiff alleges that, in the same appointment, the doctor, Defendant Antonini, told him that he could not get the same care as if he was not a convict; the doctor told him that CMS would not pay for surgeries for both his legs and ears, so he would have to "choose" which he wanted to keep (*Id.* at pgs. 3-4, 13). Plaintiff indicates he chose to keep his legs and lose his hearing (*Id.* at pgs. 4, 13).

In March 2005, Plaintiff was given a hearing test; the technician told him that he had lost some of his hearing in both ears (*Id.* at pgs. 4, 14). On May 16, Plaintiff filed a grievance (*Id.* at pg. 4). Plaintiff then had surgery on one of his legs (*Id.* at pg. 14). After he returned, he was interviewed on the grievance. During that interview, Defendant Ryan allegedly told Plaintiff that if he pursued a grievance against the doctor, then he would never get treatment; this was not a threat, but a warning (*Id.* at pgs. 4, 14).

3

On July 14, 2005, Plaintiff had bypass surgery on his other leg (*Id*. at pgs. 4, 14). During this time, Plaintiff had developed an infection in his ear; it was affecting his recovery status (*Id.* at pgs. 4, 14). Plaintiff was given intravenous antibiotics and eardrops (*Id.* at pgs. 4, 14-15). On August 24, Plaintiff had an ear evaluation at Foote hospital, and a tube was inserted in Plaintiff's ear by the doctor (*Id.* at pgs. 5, 15). The doctor told him that the left ear was not operable. On September 27, Plaintiff refused to go to a doctor's appointment; he believes that the appointment was a follow-up exam regarding his leg surgery, and he says that his legs were just fine at the time. On the refusal slip, Plaintiff indicated that he wanted to have an appointment regarding his ears (*Id*. at pg. 15). In November, Plaintiff's ear was painful and bleeding. He kited health care on November 16 and was put on Keflex for the infection (*Id.* at pgs. 4-5). Every attempt to obtain help from health care was responded to; he was prescribed more ear drops or antibiotics each time, but the medications did not help him (*Id*. at pg 5).

On May 10, 2006, Plaintiff's unit officer sent him to health care because he was disoriented and dizzy (*Id*. at pgs. 5, 17). Defendant Ives called in the doctor (*Id.* at pg. 5). The doctor told him that he needed surgery, but it was too late for the left ear. He was prescribed antibiotics and eardrops (*Id.* at pg. 18). The doctor allegedly also told him that CMS would never pay for a surgery, but it wouldn't matter because it was too late and surgery would not help (*Id.* at pgs. 5-6, 18). While the doctor was out, Plaintiff looked at his file and found a letter dated July 12, 2005, stating that he had hearing loss from an ear infection eight months prior (*Id*. at pgs. 6, 18).

On January 16, 2006, Plaintiff filed grievance JCF-2006-01-126-12d2; this is the only grievance that Plaintiff has ever pursued to Step III (Dkt. #24, Ex. A). Plaintiff attached this

4

grievance to the Complaint (Dkt. #1, p. 30 of 50). In it, Plaintiff complains of ear problems. None of the MDOC Defendants were named in this grievance, but Plaintiff's grievance against Dr. Antonini is described. The response to this grievance indicated that there were no kites in Plaintiff's medical record asking to be seen for his ear problems, and was signed by Defendants Ryan and Ives (*Id.* at pgs. 5, 16). The Step II response was signed by Defendant Jones; Plaintiff alleges that Jones's response was a cover-up to protect the doctors. The Step III response indicated that Plaintiff had missed his follow-up appointment; Plaintiff claims that the appointment he missed was not for his ear (*Id.* at pg 16). The response was prepared by Defendant Martin and signed by Defendant Armstrong. Defendant Vasbinder was listed as being sent a copy of the response.

## II. ANALYSIS

### A. The Legal Standards

#### (1) Legal Standard for Motions to Dismiss

Fed. R. Civ. P 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even in everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. ----, 127 S.Ct. 1955, 1965 (2007), *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007). "Rule 12(b)(6) does not countenance. . . dismissals based on a judge's disbelief of a complaint's factual allegations," *Twombly*, 127 S.Ct. at 1965 (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

5

"However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Columbia Natural Res., Inc. V. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1994). "In practice, a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *In re DeLorean*, 991 F.2d 1236, 1240 (6th Cir. 1993) (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)). *See also*, *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987) (liberal Rule 12(b)(6) review is not afforded legal conclusions and unwarranted factual inferences); *Ana Leon T. v. Federal Reserve Bank*, 823 F.2d 928, 930 (6th Cir. 1987) (*per curiam*) (mere conclusions are not afforded liberal Rule 12(b)(6) review).

*Conley v. Gibson*, 355 U.S. 41, 46 (1957), spoke of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can *prove no set of facts* in support of his claim which would entitle him to relief." (Emphasis supplied.). *Twombly*, notes that under a "literal reading of *Conley's* 'no set of facts' standard, a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 127 S.Ct. at 1968. *Twombly*, rejects this literal reading of *Conley* and required that pleadings state sufficient facts to show not just a possible, but a "plausible" claim of relief. Instead of the 'no set of facts' standard of *Conley*, *Twombly* endorsed the standard that a complaint be plausible to the extent that from the facts alleged there is a " 'reasonably founded hope' that a plaintiff would be able to make a case," citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005) and its quote from *Blue*

*Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975).

      (2)    <u>Legal Standard for Summary Judgment</u>

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Moreover, when a motion for summary judgment is filed, the adverse party may not merely rely "upon the mere allegations or denials of the adverse party's pleading, but . . . by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue

for trial." Fed. R. Civ. P. 56(e).

   B.   **Factual Analysis**

   (1)   Plaintiff Exhausted His Remedies As To Dr. Antonini

Under the Prisoner Litigation Reform Act, a prison inmate cannot maintain a civil rights action challenging prison conditions if he did not first exhaust "such administrative remedies as are available." The Supreme Court clarified that a prisoner must follow the state corrections system's procedures and *properly* exhaust all administrative remedies before he may bring a cause of action in federal court. *Woodford v. Ngo*, 126 S. Ct. 2378 (2006). Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules." *Id.* at 2386. The *Woodford* Court explained:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . . For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court. And acceptance of the late grievance would not thwart the prisoner's wish to bypass the administrative process; the prisoner could easily achieve this by violating other procedural rules until the prison administration has no alternative but to dismiss the grievance on procedural grounds. We are confident that the PLRA did not create such a toothless scheme.

*Id.* at 2388. Thus, an untimely or otherwise improper grievance, even though appealed through all steps of a grievance procedure, does not fulfill the PLRA exhaustion requirement.

Prisoners at MDOC facilities are given the right to "[seek] redress for alleged violations of policy and procedure or unsatisfactory conditions," but prisoners making grievances must follow certain rules and deadlines. PD Preamble. These requirements are laid out in MDOC

8

Policy Directive, Prisoner/Parolee Grievances (the "Policy Directive" or "PD").

The Policy Directive first requires that, within two business days of becoming aware of a grievable issue, a prisoner must first make an informal attempt to resolve it, unless he is prevented from doing so by circumstances outside of his control. PD § R. If he is dissatisfied with the result of this attempt, he may proceed to Step I of the grievance process. On a form supplied by MDOC, the prisoner must briefly describe the facts of the issue being grieved. PD § T. This form must be filed with a designated Grievance Coordinator within five business days of the prisoner's informal attempt at resolution. PD § X.

If the prisoner is dissatisfied with the Step I response, he may appeal to Step II by obtaining an appeal form within five business days of the response and submitting the appeal within five business days of obtaining the form. PD § DD. The Step II respondent is designated by the Policy Directive, such as the Parole Board Chairperson for grievances involving the Parole Board. If the prisoner is still dissatisfied after receiving the Step II response, he may appeal to Step III using the same appeal form. The Prisoner Affairs Section, on behalf of the MDOC Director, is the respondent for Step III appeals.

Exhaustion of this process is a precondition to maintaining a lawsuit. 42 U.S.C § 1997e(a). As noted above, the United States Supreme Court has held that permitting appeals of improperly filed grievances "would permit a prisoner to bypass deliberately and flagrantly administrative review without any risk of sanction." *Woodford*, 126 S. Ct. at 2390. A grievance that does not comply with the procedural requirements of a prison's grievance policy, such as time deadlines, is not properly exhausted, and a lawsuit cannot proceed. *Woodford* 126 S. Ct. at 2378; *Jones v Bock, et al,* 127 S. Ct. 910, 923-24 (2007). *Jones* held that hat exhaustion of

9

administrate remedies is an affirmative defense and not part of an inmates *prima facie* case.

The applicable prison grievance policy in this case is MDOC PD 03.02.130 (effective date 12/19/2003). This policy details the applicable administrative process for the treatment of inmate grievances. PD 03.02.130 outlines a three step grievance process; to properly exhaust, all three steps of this process must be completed before filing a lawsuit (Dkt. #20, Ex. A). Furthermore, PD 03.02.130 requires that grievances be filed in a timely manner. *Id*. at Section (G)(4).

It is undisputed that Plaintiff pursued his grievance against Defendant Antonini, Grievance No. JCF-06-01-126-12D2, through Step III of the grievance process. Despite having pursued this grievance through Step III, Defendant Antonini, however argues that Plaintiff has not exhausted his administrative remedies. First, Defendant argues Plaintiff's grievance was untimely. The grievance policy requires that inmates try to resolve grievable issues within two business days and then submit their grievance within five business days of trying to resolve the issue. In this case, Plaintiff submitted Grievance No. JCF-06-01-126-12D2 at Step I on January 16, 2006, citing the Date of Incident as "ongoing." He wrote "continuously" as the date on which he tried to resolve the matter. Yet, the body of the grievance shows that the grievance actually related to a November 16, 2005, kite for a health care appointment. Accordingly, Defendant Antonini argues that Plaintiff's grievance was untimely even though MDOC failed to reject it as such and denied it on the merits.

Second, Defendant Antonini argues that Grievance No. JCF-06-01-126-12D2 is vague and thus in violation of the grievance policy (Dkt. #20, Ex. A at ¶ G.1, p. 2) in that it is not clear exactly what incident Plaintiff was grieving or what action Plaintiff was seeking in response to

the grievance. Thus, Defendant Antonini argues that Plaintiff has not exhausted all of his administrative remedies prior to filing this suit. Accordingly, absent documentation or some showing of the exhaustion of the administrative remedies available to him, Defendant contends Plaintiff cannot continue this suit, because it is barred by 42 U.S.C. §1997e.

"Under the doctrine of [administrative exhaustion], both parties are obligated to raise objections in the administrative proceedings in order for the issue to be properly before a reviewing court." *See, Baker v. Vanderark*, 2007 WL 3244075 at *7 (W.D. Mich. 2007). If Defendant is correct, how would Plaintiff be on notice that he is/was not in compliance with Paragraph T? Here, Defendant Antonini would have this Court place the burden of raising objections only on a prisoner and not on the MDOC or target of the grievance. That interpretation is inconsistent with the doctrine and is inconsistent with the purpose of the PLRA. The PLRA sought to reduce the quantity of prisoner suits while, at the same time, improving the quality of the suits. The quantity of suits was lowered by requiring administrative exhaustion; prisoners who fail to exhaust available administrative remedies will have their suits summarily dismissed. The quality of suits was raised through proper exhaustion; prison officials investigate those claims that are timely filed and contain sufficient information. When prison officials fail to raise procedural problems during the grievance process, too many suits make it to federal courts on a record where the procedural problem has not been adequately developed. If courts were to dismiss those procedurally flawed claims to which no objection was raised in the administrative process, there would be a reduced incentive for the prison facility or the respondent on the grievance to try to get it right at the administrative level. While it may allow certain procedurally flawed suits to continue in court causing a case increase, in the long run

11

rejecting these cases would lead to more procedurally flawed suits getting into court because it tolerates a slack review process in the prison administrative review. Having the prison grievance administrators or respondents raise procedural flaws in the administrative process or they will be deemed waived will increase the incentives for prison grievance administrators and respondents to be more attentive to such flaws.

Interpreting *Woodford* and the proper exhaustion doctrine to require MDOC to raise the procedural problems during the grievance procedure or they are waived is consistent with MDOC policy and with the Supreme Court's decision in *Jones v. Bock*, --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).[2] PD 03.02.103 identifies a number of situations in which the Grievance Coordinator must reject a grievance. At the same time, the policy also gives a Grievance Coordinator discretion to accept a grievance that is vague or not timely filed. The policy does not specifically provide for rejection if a grievant fails to identify the specific defendants.

A fair interpretation of PD 03.02.103 gives the Grievance Coordinator discretion to accept or reject a grievance that fails to identify specific defendants on the basis of the grievance being vague. Under Paragraph Y, a Grievance Coordinator may respond to a grievance without an interview if only a minimal investigation is needed or if the grievance is rejected for a reason authorized by the policy. The Paragraph further provides that if the Coordinator responds to the

---

[2] *Jones v. Bock*, --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) held that: (1) failure to exhaust is an affirmative defense under the PLRA that does not need to be specially plead in a complaint; (2) exhaustion is not per se inadequate simply because a defendant was not named in the grievances; and (3) where a complaint contains both exhausted and unexhausted claims, the court should proceed with the exhausted claims while dismissing the unexhausted claims, rather than dismissing the complaint in its entirety.

merits of the grievance, an interview with the prisoner must be conducted. The purposes of that interview, as provided under Paragraph AA, are to permit the grievant to further explain the problem and to allow the Coordinator to gather any additional information needed to respond. Here, the Step I Grievance Response indicates that Plaintiff was interviewed (*See*, Dkt. #1, p. 32 of 50).

In the record before this Court, taking facts in a light most favorable to Plaintiff, MDOC exercised its discretion and accepted Grievance No. JCF-06-01-126-12D2. Rather than dismissing the grievance on a procedural issue and allowing Plaintiff to address the procedural concerns, MDOC opted to address the grievance on the merits and interviewed Plaintiff. If MDOC needed additional information, such as the dates of the alleged incidents that are the subject of the Complaint, the policy provides that the interview is the time to gather that information. By accepting the grievance, investigating the claim, and responding on the merits all the way through Step III of the procedure, MDOC cannot now raise a procedural problem for the first time in this Court.

       (2)     <u>Plaintiff Has Failed To State A Claim of Deliberate Indifference</u>

In the context of medical care, a prisoner's Eighth Amendment right to be free of cruel and unusual punishment is violated only when a prisoner can demonstrate that a "deliberate indifference" has been shown to his serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To demonstrate a "deliberate indifference" to his medical needs, a prisoner must show that Defendant's actions rise to the level of an "unnecessary and wanton infliction of pain." *Id.* at 104. Mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment. *Id.* at 106. Additionally, a prisoner

13

seeking to prevail on an Eighth Amendment claim under 42 U.S.C. § 1983 must also show that his medical need is "serious." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

Plaintiff argues that the facts as stated in his Complaint state a sufficient claim of deliberate indifference as to Dr. Antonini. Yet, even taken in a light most favorable to Plaintiff, his allegations as to Dr. Antonini consist of Plaintiff's disagreement with the treatment provided and they are not indicative of deliberate indifference. Based on a review of Plaintiff's own allegations and exhibits, there can be no serious dispute that Plaintiff's ear was flushed, and he was given antibiotics, ear drops, hearing testing, and even surgery to treat his ear problems. Moreover, as described below, the alleged delay in treatment is outside the applicable three year statute of limitations, as is Plaintiff's alleged total loss of hearing in his left ear.

The courts typically do not intervene in questions of medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976). Complaints that a medical provider did not provide specific medications, treatment, or dosages, or even negligently failed to provide adequate medical care do not state a claim of deliberate indifference as to a prisoner's civil rights claims. *See Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976); *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999); *Williams v. Duckworth*, 598 F. Supp 9, 13-15 (N.D. Ind. 1983), aff'd without opinion, 749 F.2d 34 (7th Cir. 1984). Following these legal standards, Plaintiff has not stated a proper 42 U.S.C. §1983 claim as to Defendant Antonini.

(3)  The Statute of Limitations Is Also A Partial Bar

In *McClune v. Grand Rapids*, 842 F.2d 903 (6th Cir. 1988), the Sixth Circuit Court of Appeals considered the limitations period applicable to cases brought under 41 U.S.C. § 1983. The *McClune* Court first noted the holding of the United States Supreme Court in *Wilson*, which indicated that the appropriate statue of limitations to apply in all section 1983 cases is the state statute of limitations controlling personal injury actions. *McClune*, 842 F.2d at 905. Next, the *McClune* court noted that for causes of action arising in Michigan, the applicable limitations period is three years for personal injury claims. *Id.* Thus, actions arising in Michigan under 42 U.S.C. 1983 are subject to a three-year limitations period.

Accordingly, to the extent that Plaintiff's claims arose prior to August 10, 2004 (three years before the filing of Plaintiff's Complaint on August 10, 2007), they must fail, because any allegation arising out of treatment given or not given relative to such health issues is outside the statute of limitations period applicable to this § 1983 claim. In this case, Plaintiff makes allegations (1) that he kited for assistance with earaches between April 29, 2004, and June 26, 2004, but did not receive treatment and (2) that he submitted a grievance related to this issue on July 29, 2004 (Grievance No. JCF04080209812D3), stating that he had "lost total hearing ability in [his] left ear" as of that date (Dkt. #1, pgs. 45-47 of 50). Plaintiff's claims of delay in treatment related to that time period and through August 9, 2004, including his claim regarding hearing loss in his left ear, are barred by the statute of limitations.

(4)  Plaintiff Has Filed to State A Claim Under The Americans With Disabilities Act

Defendant Antonini is an independent contractor of CMS, a private independent contractor of the State of Michigan, and thus not a "public entity" as defined by the ADA. Title

15

II of the ADA states that "no qualified individual with a disability, shall by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. §12131(1)(B) defines a "public entity" as follows:

As used in this subchapter:

(1) Public entity

The term "public entity" means–

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

( C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 502(8) of Title 45.)

Defendant Antonini is not a "public entity" pursuant to §12131(1)(B). He is an independent contractor of CMS. CMS is a private corporation contracted with the State to provide medical services in MDOC prisons. Defendant Antonini is not "any State or local government," nor is he "any department, agency, special purpose district, or other instrumentality of a State or States or local government."

In *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206 (1998), the United States Supreme Court, relying on the definition of 52 U.S.C. §12131(1)(B), found that "[s]tate prisons fall squarely within the statutory definition of "public entity." *Id*. at 210.[3] Yet, the Court applied the ADA to the State of Pennsylvania, not to any of its contractors. Although the

---

[3]The Court also found that "medical services" were among the "benefits" of the "services, programs, or activities of a public entity" under 42 U.S.C. §12132. *Yeskey*, 524 U.S. at 208.

MDOC and the State of Michigan are public entities under the definition contained in the ADA, CMS and its independent contractor physicians are private contractors and clearly are not public entities. *Vandermolen v. City of Roosevelt Park, et. al.*, 1997 U.S. Dist. LEXIS 19335 (W.D. Mich 1997).

Moreover, an individual Defendant cannot be held liable under the ADA. 42 U.S.C. 12131(1). The Sixth Circuit held in *Lee v. Mich. Parole Bd.,* 104 Fed. Appx. 490, 492-493 (6th Cir. 2004):

> Assuming that Lee is handicapped within the meaning of the ADA and the RA, his complaint contained no allegations that the defendants discriminated against him solely because of his alleged handicap. Furthermore, Lee may not maintain an action under the ADA or the RA against the individual defendants identified in his complaint because neither the ADA nor the RA impose liability upon individuals. 29 U.S.C. § 794(b)(RA); 42 U.S.C. § 12131(1)(ADA).

Accordingly, Plaintiffs claim under the ADA against Defendant Antonini fails as a matter of law.

### III. RECOMMENDATION

Because Plaintiff has failed to state any claim upon which relief may be granted and has raised claims that are barred by the applicable statute of limitations, it is **RECOMMENDED** that Defendant Antonini's motion to dismiss be **GRANTED**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections

which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pgs. in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. A party may file a reply brief within 5 days of service of a response. The reply shall be not more than five (5) pgs. in length unless by motion and order such pg. limit is extended by the Court.

Dated: January 31, 2008　　　　　　　　　s/ Steven D. Pepe
Ann Arbor, MI　　　　　　　　　　　　　United States Magistrate Judge


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 31, 2008.

　　　　　　　　　　　　　　　　　　　s/ Alissa Greer
　　　　　　　　　　　　　　　　　　　Case Manager to Magistrate
　　　　　　　　　　　　　　　　　　　Judge Steven D. Pepe
　　　　　　　　　　　　　　　　　　　(734) 741-2298