UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT BASAT, #472479,

       Plaintiff,            CIVIL NO: 07-13332

                                  DISTRICT JUDGE DENISE PAGE HOOD
                                  MAGISTRATE JUDGE STEVEN D. PEPE
vs.

PATRICIA CARUSO, DOUGLAS VASBINDER,
DR. ANTONINI, JOY J. RYAN, CONNIE IVES, PEGGY LEE,
ALFRED JONES, NANCY MARTIN, JAMES ARMSTRONG,
JOHN DOE AND MARY DOE,

       Defendants.
_____/

## REPORT AND RECOMMENDATION

      This is a *pro se* prisoner lawsuit under 42 U.S.C. § 1983 alleging violations of the Eighth Amendment and Americans with Disabilities Act ("ADA"). At the time of the incidents which give rise to the present action, Plaintiff was incarcerated at the G. Robert Cotton Correctional Facility in Jackson, Michigan, part of the Michigan Department of Corrections. Plaintiff currently is incarcerated at the Gus Harrison Correctional Facility in Adrian, Michigan. Plaintiff alleges that Defendants failed to treat an ear infection timely and/or properly, resulting in total hearing loss in his left ear as well as partial hearing loss in his right ear.

      Plaintiff filed this suit on August 10, 2007, and Defendants Patricia Caruso, Douglas Vasbinder, Joy Ryan, Connie Ives, Peggy Lee, Alfred Jones, Nancy Martin, and James Armstrong ("MDOC Defendants") were served via waiver on September 10, 2007. Plaintiff is

1

also suing Audberto Antonini, M.D., an independent contractor of Correctional Medical Services, Inc. ("CMS"), a private independent contractor of the State of Michigan (Dkt. #20, p. 6). On November 6, 2007, the MDOC Defendants filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim and alternative motion for summary judgment under Fed. R. Civ. P. 56(b) based on failure to exhaust administrative remedies (Dkt. #24). All pre-trial matters were referred under 28 U.S.C. § 636(b) (Dkt. #5). For the reasons stated below, it is **RECOMMENDED** that the MDOC Defendants' motion be **GRANTED**.

**I.    BACKGROUND**

Plaintiff alleges that he began having earaches in late January, 2004 (Complaint, pgs. 2, 9).[1] Health care told him that it might be an ear infection, gave him medication, and told him that it should clear up (*Id.* at pgs. 2, 9). On February 19, Plaintiff was transferred to the Cotton Correctional Facility ("JCF"), a "certified chronic care facility" (*Id.* at pgs. 2, 9). Plaintiff kited health care on March 1, complaining of leg pain and dizziness (*Id*. at pg. 9). After the first week of March, Plaintiff went to health care and was told that he had an ear infection (*Id.* at pg. 10).

On April 22, Plaintiff went to Foote Hospital for medical tests on his legs, but no tests were done on his ears (*Id.* at pgs. 2, 10). Plaintiff sent kites to health care on April 29 and May 21, but he did not receive responses. Plaintiff went to health care on May 25; his ear was flushed with peroxide and he was told that the infection would clear up (*Id*. at pg. 10). He alleges that this was done on his right ear only because the nurse said that the left ear looked "bad" and he didn't want to "fool with it" (*Id.* at pg. 11). On June 4, Plaintiff sent a kite to health care; the

---

[1] The page numbers refer to Plaintiff's type written Complaint, which begins on page 6 of Dkt. #1.

response by Defendant Ryan indicated that Plaintiff had an appointment on June 16 (*Id.* at pgs. 2, 11). That appointment was cancelled, and Plaintiff sent more kites on June 26 and July 9 (*Id.* at pgs. 2-3, 11). Plaintiff filed a Step I grievance on July 29, 2004; this grievance was answered by Defendants Ives and Lee (*Id.* at pgs. 3, 11-12). The response indicated that Plaintiff had an appointment for September 9. All of the above events occurred more than three years before Plaintiff filed this suit.

On September 9, 2004, Plaintiff went to health care and was prescribed Augmentin for his ear. On October 20, Plaintiff kited health care; he was told by Ryan that he had an appointment on October 25 (*Id*. at pgs. 3, 12). On that day, he waited for four hours before having to leave without seeing the doctor (*Id.* at pg. 12). Plaintiff filed a kite on October 28; on October 29, Plaintiff was prescribed the antibiotic Levaquin for his ears (*Id.* at pgs. 3, 12). Plaintiff alleges that, in the same appointment, the doctor, Defendant Antonini, told him that he could not get the same care as if he was not a convict; the doctor told him that CMS would not pay for surgeries for both his legs and ears, so he would have to "choose" which he wanted to keep (*Id.* at pgs. 3-4, 13). Plaintiff indicates he chose to keep his legs and lose his hearing (*Id*. at pgs. 4, 13).

In March 2005, Plaintiff was given a hearing test; the technician told him that he had lost some of his hearing in both ears (*Id.* at pgs. 4, 14). On May 16, Plaintiff filed a grievance (*Id*. at pg. 4). Plaintiff then had surgery on one of his legs (*Id*. at pg. 14). After he returned, he was interviewed on the grievance. During that interview, Defendant Ryan allegedly told Plaintiff that if he pursued a grievance against the doctor, then he would never get treatment; this was not a threat, but a warning (*Id*. at pgs. 4, 14).

3

On July 14, 2005, Plaintiff had bypass surgery on his other leg (*Id*. at pgs. 4, 14). During this time, Plaintiff had developed an infection in his ear; it was affecting his recovery status (*Id.* at pgs. 4, 14). Plaintiff was given intravenous antibiotics and eardrops (*Id.* at pgs. 4, 14-15). On August 24, Plaintiff had an ear evaluation at Foote hospital, and a tube was inserted in Plaintiff's ear by the doctor (*Id.* at pgs. 5, 15). The doctor told him that the left ear was not operable. On September 27, Plaintiff refused to go to a doctor's appointment; he believes that the appointment was a follow-up exam regarding his leg surgery, and he says that his legs were just fine at the time. On the refusal slip, Plaintiff indicated that he wanted to have an appointment regarding his ears (*Id*. at pg. 15). In November, Plaintiff's ear was painful and bleeding. He kited health care on November 16 and was put on Keflex for the infection (*Id.* at pgs. 4-5). Every attempt to obtain help from health care was responded to; he was prescribed more ear drops or antibiotics each time, but the medications did not help him (*Id*. at pg 5).

On May 10, 2006, Plaintiff's unit officer sent him to health care because he was disoriented and dizzy (*Id*. at pgs. 5, 17). Defendant Ives called in the doctor (*Id.* at pg. 5). The doctor told him that he needed surgery, but it was too late for the left ear. He was prescribed antibiotics and eardrops (*Id.* at pg. 18). The doctor allegedly also told him that CMS would never pay for a surgery, but it wouldn't matter because it was too late and surgery would not help (*Id.* at pgs. 5-6, 18). While the doctor was out, Plaintiff looked at his file and found a letter dated July 12, 2005, stating that he had hearing loss from an ear infection eight months prior (*Id*. at pgs. 6, 18).

On January 16, 2006, Plaintiff filed grievance JCF-2006-01-126-12d2; this is the only grievance that Plaintiff has ever pursued to Step III (Dkt. #24, Ex. A). Plaintiff attached this

4

grievance to the Complaint. In it, Plaintiff complains of ear problems. None of the MDOC Defendants were named in this grievance. The response to this grievance indicated that there were no kites in Plaintiff's medical record asking to be seen for his ear problems, and was signed by Defendants Ryan and Ives (*Id.* at pgs. 5, 16). The Step II response was signed by Defendant Jones; Plaintiff alleges that Jones's response was a cover-up to protect the doctors. The Step III response indicated that Plaintiff had missed his follow-up appointment; Plaintiff claims that the appointment he missed was not for his ear (*Id.* at pg 16). The response was prepared by Defendant Martin and signed by Defendant Armstrong. Defendant Vasbinder was listed as being sent a copy of the response.

## II. ANALYSIS

### A. The Legal Standards

Under the Prisoner Litigation Reform Act, a prison inmate cannot maintain a civil rights action challenging prison conditions if he did not first exhaust "such administrative remedies as are available." The Supreme Court clarified that a prisoner must follow the state corrections system's procedures and *properly* exhaust all administrative remedies before he may bring a cause of action in federal court. *Woodford v. Ngo*, 126 S. Ct. 2378 (2006). Proper exhaustion requires "compliance with an agency's deadlines and other critical procedural rules." *Id.* at 2386. The *Woodford* Court explained:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . . For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the

5

> grievance as untimely, the prisoner could proceed directly to federal court. And acceptance of the late grievance would not thwart the prisoner's wish to bypass the administrative process; the prisoner could easily achieve this by violating other procedural rules until the prison administration has no alternative but to dismiss the grievance on procedural grounds. We are confident that the PLRA did not create such a toothless scheme.

*Id.* at 2388. Thus, an untimely or otherwise improper grievance, even though appealed through all steps of a grievance procedure, does not fulfill the PLRA exhaustion requirement.

Prisoners at MDOC facilities are given the right to "[seek] redress for alleged violations of policy and procedure or unsatisfactory conditions," but prisoners making grievances must follow certain rules and deadlines. PD Preamble. These requirements are laid out in MDOC Policy Directive, Prisoner/Parolee Grievances (the "Policy Directive" or "PD").

In *Jones*, the Supreme Court held that the PLRA does not require that a prisoner name all of the defendants in his grievances. *Jones*, 127 S Ct at 922. "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* at 923. *Jones*, however, was based on a previous version of MDOC Policy Directive 03.02.130 that did not require that prisoners list names of potential defendants in their grievances. *Id.* at 916 (discussing policy effective November 1, 2000). Yet, that policy directive was changed prior to Plaintiff filing his Complaint or grievances. The MDOC has specific administrative procedures that prisoners must follow to exhaust their administrative remedies.

MDOC Policy Directive 03.02.130 lays out a three-step process that prisoners must complete before being considered to have exhausted their claims (Dkt. #20, Ex. A, MDOC PD 03.02.130 (Effective December 19, 2003)). There are specific rules in PD 03.02.130 (such as time frames and content policies) that prisoners must follow, or else they face having their grievances rejected. Section T of P.D. 03.02.130 requires prisoners to include names of potential

defendants in their grievances.

   B.   **Factual Analysis**

Plaintiff has filed and pursued only one grievance through Step III of the process. That grievance, JCF-2006-01-126-12d2, did not name any of the MDOC Defendants; it named a single doctor, Defendant Antonini, as being responsible for Plaintiff's alleged injuries. The fact that the MDOC did not reject Plaintiff's grievance for failing to name the Defendants is not an endorsement of the correctness of that grievance. Where a prisoner fails to name all of the potential defendants, the MDOC has no way of knowing that names have been left out until a prisoner names defendants in a lawsuit. It is the prisoner, and not the prison, that is in the best position to determine who is being accused of wrongdoing with regard to any alleged incident.

Because Defendants Caruso, Vasbinder, Ryan, Ives, Lee, Jones, Martin, and Armstrong were not named in that grievance and MDOC policy requires Plaintiff to name potential Defendants in his grievances, Plaintiff has not exhausted his claim as to any of these Defendants. It should be noted that Plaintiff does not dispute his failure to exhaust as to these Defendants and has moved to amend his Complaint (Dkt. #29). In that revised Complaint, Plaintiff has removed the MDOC Defendants named in his original Complaint (Dkt. #30).

 Accordingly, it is **RECOMMENDED** that Defendants Caruso, Vasbinder, Ryan, Ives, Lee, Jones, Martin, and Armstrong's motion be **GRANTED**, and that they be dismissed from this action due to Plaintiff's failure to exhaust his administrative remedies.

**III.   RECOMMENDATION**

For the reasons stated above, it is **RECOMMENDED** that Defendants Caruso, Vasbinder, Ryan, Ives, Lee, Jones, Martin, and Armstrong's motion be **GRANTED**, and that they be dismissed

7

from this action due to Plaintiff's failure to exhaust his administrative remedies. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. *Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pgs. in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections. A party may file a reply brief within 5 days of service of a response. The reply shall be not more than five (5) pgs. in length unless by motion and order such pg. limit is extended by the Court.

Dated: January 31, 2008                   s/ Steven D. Pepe  
Ann Arbor, MI                                     United States Magistrate Judge

**CERTIFICATE OF SERVICE**
I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the

attorneys and/or parties of record by electronic means or U.S. Mail on January 31, 2008.

                                                s/ Alissa Greer
Case Manager to Magistrate
Judge Steven D. Pepe
(734) 741-2298